

**SIGNED this 21st day of August, 2015.**

_____
**CRAIG A. GARGOTTA**
**UNITED STATES BANKRUPTCY JUDGE**

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | | |
|---|---|---|
| | § | |
| IN RE: | § | CASE NO. 10-11365-TMD |
| | § | |
| CLIFFORD JOSEPH WOERNER and | § | |
| GAIL SUZANNE WOERNER, | § | |
| | § | CHAPTER 7 |
| Debtors. | § | |

### MEMORANDUM OPINION ON REMAND
### REGARDING AMENDED FINAL APPLICATION OF BARRON & NEWBURGER, P.C. FOR COMPENSATION AS ATTORNEYS FOR DEBTORS FROM MAY 4, 2010 TO APRIL 20, 2011 (ECF NO. 269)

Came on to be considered the Amended Final Application of Barron & Newburger, P.C.[1] for Compensation as Attorneys for Debtors from May 4, 2010 to April 20, 2011 (ECF No. 269).   For the reasons stated herein, the Court finds that B&N's Amended Final Application for Compensation is allowed in the amount of $46,311.00.[2]   All additional amounts requested are disallowed.

---

[1] Hereinafter referred to as "B&N" or "Applicant."

[2] The Court previously allowed reimbursement of Applicant's costs in the amount of $5,793.37.  No party appealed that determination.

## PROCEDURAL BACKGROUND

This matter is before the Court upon remand by the Fifth Circuit Court of Appeals of B&N's Amended Final Application for Compensation to this Court (ECF No. 269).[3] This matter has proceeded through appeals in the District Court, a Fifth Circuit panel, and a Fifth Circuit en banc consideration. The Fifth Circuit remanded the matter to this Court after concluding that its prior precedent in *In re Pro-Snax Distributors, Inc.*, 157 F.3d 414 (5th Cir. 1998), is no longer controlling law in this circuit. In *Pro-Snax*, a Fifth Circuit panel found that, for legal services to be compensable under 11 U.S.C. § 330 (2012)[4], a fee applicant must prove that the service resulted in an "identifiable, tangible, and material benefit to the estate." *Id*. at 426. In en banc consideration of the instant case, the circuit has now found that an award of fees must be evaluated as to whether the fees for services "were reasonable at the time" performed. *Barron & Newburger, P.C. v. Texas Skyline, Ltd. (In re Woerner)*, 783 F.3d 266, 277 (5th Cir. 2015) (en banc).[5] Previously, this Court denied the majority of B&N's amended fee application because it found that B&N's legal services had not resulted in a material benefit to the estate. Given the circuit's new holding that bankruptcy courts must examine fee awards under the paradigm of whether the services rendered were reasonable at the time performed, the circuit directed this Court to re-examine its fee determination under the new standard. *Id*.

A discussion of the procedural history of this case is instructive for purposes of understanding why this Court made its original ruling on B&N's amended fee application

---

[3] *See* ECF No. 421 (Fifth Circuit Court of Appeals Judgment on Rehearing En Banc); ECF No. 422 (District Court Order Remanding Case to Bankruptcy Court).

[4] References herein are to the Bankruptcy Code, 11 U.S.C. § *et seq*, unless otherwise noted.

[5] For clarity, citations to the Fifth Circuit's en banc decision in this case shall be referred to as "En Banc Decision."

and what the Court must consider on remand.  In its en banc ruling, the Fifth Circuit stated a number of operative facts, which this Court shall recount below.

In 2006, Debtor Clifford Woerner and Texas Skyline, Ltd. formed a limited partnership for purposes of a real estate venture.  *Id*. at 268.  Woerner served as the limited partner and Texas Skyline was the sole investor and a limited partner in the project.  *Id*. Over three years, Woerner misappropriated partnership funds for his personal use.  *Id*.  Texas Skyline discovered Woerner's misappropriation and sued Woerner in state court for breach of partnership agreement and breach of fiduciary duties.  *Id*.  The state court ruled in favor of Texas Skyline and set a remedies hearing for May 14, 2014.  *Id*.  Woerner then considered bankruptcy relief and, with B&N's assistance, filed a petition for chapter 11 relief on May 13, 2010, the night before the remedies hearing in state court.[6] *Id*. at 268-69.

B&N provided the requisite services for any debtor in bankruptcy—the preparation of a petition, schedules, and statement of financial affairs.  B&N also sought court approval of its employment as debtors' counsel.  B&N also represented Woerner in opposing Texas Skyline's Motion for Relief from Stay, in which Texas Skyline requested that this Court lift the automatic stay under § 362(d) so that the state court could determine Texas Skyline's remedies against Woerner.  This Court lifted the stay to allow Texas Skyline to proceed in state court to liquidate its debt against Woerner.  B&N performed other services for Woerner, namely defending complaints to determine dischargeability of debt under § 523(a) that Texas Skyline and John Baker, a creditor, initiated against Woerner.  As a result of the foregoing litigation between the parties; Woerner, Texas Skyline, and Baker agreed to mediate their

---

[6] Clifford Woerner did file the chapter 11 case with his wife, Gail.  She was subsequently dismissed when the Woerner case was converted to chapter 7.  Unless otherwise noted, references to "Debtor" or "Woerner" in the singular refer to Clifford Woerner.

disputes with Chief Bankruptcy Judge Ronald B. King.  The parties dispute whether there was a mediated settlement.

During the pendency of the chapter 11 case, B&N, on behalf of Debtors, amended their schedules to reflect undisclosed personal assets; including investments, jewelry, firearms, and fur coats that were not originally disclosed.  *Id*. at 269.[7]  This non-disclosure prompted Baker to file a Motion to Convert Debtors' case from chapter 11 to chapter 7.  Texas Skyline moved to intervene in support of conversion. *Id*. B&N filed a Joint Motion to Compromise with this Court in which B&N maintained that a mediated resolution had been reached and that the resolution would result in a confirmable chapter 11 plan.  *Id*. at 269.  Baker disagreed and this Court denied the Joint Motion to Compromise.  B&N opposed the Motion to Convert and asked this Court to approve the settlement.  *Id*.  B&N further maintained that conversion was not warranted because: (1) B&N had prepared a motion to sell some of Debtors' personal assets to fund an appeal of the Texas Skyline state court judgment; (2) B&N was in the process of investigating some causes of action against Texas Skyline and Baker; (3) B&N had drafted a proposed disclosure statement and plan of reorganization; and (4) B&N believed that it had identified a Texas Skyline representative guilty of partnership mismanagement.  *Id*.

After this Court denied the Joint Motion to Compromise, the Court granted the Motion to Convert to chapter 7.  The Court found that Debtors had made material omissions

---

[7] Debtors had amended their statement of financial affairs and schedules "B" and "C" on November 2, 2010. On November 24, 2010, Baker filed his Motion to Convert Case.  On December 17, 2010, Debtors filed their Joint Motion to Compromise.  Texas Skyline filed a Motion to Intervene in the Baker Motion to Convert on January 13, 2011.  Debtors amended their statement of financial affairs for the second time on February 2, 2011. Debtors amended their schedules "B" and "C" for the second time on March 19, 2011; and on March 21, 2011 the Debtors filed a notice of amended schedule "C."  Including the original filing, the statement of financial affairs and schedules "B" and "C" were filed at least three times.  After conversion to chapter 7, further amendments were made to the schedules.  *See* Transcript of Court's Ruling on B&N's Amended Fee Application, ECF No. 368, pp.6-7.

on their bankruptcy schedules, and, as such, could not meet the duty of being forthright with the Court and creditors that is incumbent on all debtors.[8] After the case was converted to chapter 7, B&N filed its amended fee application and the United States Trustee and Texas Skyline filed objections to the allowance of B&N's fees.

### B&N AMENDED FEE APPLICATION HEARING AND RULING

B&N filed its amended fee application seeking $130,656.50 in fees and $5,793.37 in expenses. *Id.* at 269-70. The United States Trustee ("UST") objected, indicating that most of the fees were not compensable under the *Pro-Snax* decision. Texas Skyline objected as well, claiming that: (1) Debtors would not have the ability to fund a chapter 11 plan; and (2) B&N was dilatory in its handling of Debtors' case, which resulted in unnecessary fees. *Id.* at 270.

Through testimony, B&N countered that: (1) it had filed a legitimate chapter 11 case for Woerner; and (2) litigation costs were driven up by Texas Skyline's conduct in the case. *Id.* This Court took the matter under advisement and issued its oral ruling on April 11, 2012. Citing controlling circuit authority in *Pro-Snax*, this Court held that, for a service to be compensable under § 330, the fee applicant must show that the service resulted in an "identifiable, tangible, and material benefit to the bankruptcy estate." 157 F.3d at 420. This Court applied the *Pro-Snax* standard to the categories of services rendered (case administration, preparing a response to a motion to lift stay, preparing bankruptcy schedules, and defending complaints to determining dischargeability of debt) and determined whether the services provided by each category should be granted in full, denied in part, or

---

[8] *See* Transcript of Court's Ruling on Baker's Motion to Convert Case to Chapter 7 (ECF No. 160, pp. 5-9).

completely disallowed. *Id*. In sum, this Court determined that much of B&N's time was attributed to services that did not result in a material benefit to the estate. *Id*.[9]

On appeal, the district court affirmed this Court's determination as to disallowance of B&N's fees based upon this Court's interpretation and application of *Pro-Snax*, but for finding error in that this Court should have granted B&N's time for preparing the fee application in the sum of $787.50. *See Barron & Newburger v. Texas Skyline et al*, No. 1:12-CV-00907-SS, Doc. 17 (W.D. Tex. January 23, 2013). This Court agrees that those fees should have been allowed and will allow the same.

## DISCUSSION

In its panel decision in this case, the Fifth Circuit determined that this Court had applied the correct standard of *Pro-Snax* because that was the binding authority in this circuit. *Barron & Newburger, P.C. v. Texas Skyline, Ltd. (In re Woerner)*, 758 F.3d 694, 702 (5th Cir. 2014).[10] Further, the Fifth Circuit examined this Court's findings as to B&N's fees and concluded that there was no reversible error because this Court had used the correct standard in ruling on the allowance of B&N's fees. *Id*. at 698. The Fifth Circuit did, however, in a special concurrence joined by all members of the panel, urge reconsideration of

---

[9] This Court noted in its oral ruling that a number of bankruptcy courts had grappled with how to apply the "material benefit to the estate" standard to chapter 11 cases that had failed. *See* ECF No. 368, p. 14. As such, this Court adopted the approach utilized in a prior decision of this Court, *In re Weaver*, 336 B.R. 115 (Bankr. W.D. Tex. 2005), wherein the Court awarded fees on a categorical basis and differentiated between customary services performed that would be compensable in all bankruptcy cases and those services that could only be compensable if there was a "material benefit to the estate."

[10] For clarity, citations to the Fifth Circuit's panel decision in this case shall be referred to as "Panel Decision."

6

the ***Pro-Snax*** standard by a sitting en banc. ***Id.*** at 706.[11]  Based upon the panel's recommendation, the Fifth Circuit considered this matter en banc.

In its en banc decision, the Fifth Circuit began its analysis by first examining the statutory framework of chapter 11 cases regarding the retention of professionals for the debtor. ***En Banc Decision***, 783 F.3d at 271.  In doing so, the court recognized that a chapter 11 debtor may retain counsel and hire professionals for the estate. ***Id.***  The court observed that Congress enacted a uniform scheme for retaining and hiring professionals and attorneys under §§ 327-330. ***Id.*** at 271-72.  Under § 330(a)(1),  an attorney whose employment was approved under § 327 may request "reasonable compensation for actual, necessary services rendered." ***Id***.  Moreover, the bankruptcy court may use its discretion in awarding compensation less than the amount requested. ***Id***.  Section 330(a)(3) directs the courts to "consider the nature, the extent, and the value of the legal services provided when determining the amount of the reasonable compensation to award, taking into consideration a number of factors listed in § 330(a)(3)." ***Id.***  Further, under § 330(a)(4), a court may not allow compensation for "services … not reasonably likely to benefit the debtor's estate; … ." § 330(a)(4)(A)(I).

The Fifth Circuit explained that § 330 "states twice, in both positive and negative terms, that professional services are compensable only if they are likely to benefit the debtor's estate or are necessary to case administration." ***Id.*** at 273.  Stated differently, a court may approve compensation of an attorney for services that are "reasonably likely to benefit" the estate and determine the reasonableness "at the time in which the service was rendered." ***Id.***  The court also recognized that litigation is a gamble and the § 330 permits a

---

[11] "The ***Pro-Snax*** actual benefit test has led to confusion among the courts of our circuit." ***Panel Decision***, 758 F.3d at 705.  "The splintered approaches to applying ***Pro-Snax*** underscore the difficulty of squaring that decision with the statute [§ 330], and the practical importance of doing so." ***Id.*** at 706.

court to compensate an attorney not only for services that were necessary, but also for good gambles where those services were objectively reasonable at the time they were performed. *Id.* at 274. As such, the court concluded that the "actual benefit" test should be replaced by a prospective standard, following the holdings in the Second, Third, and Ninth Circuits.[12]

Based upon the circuit's reconsideration of the applicable standard for fee awards under §330, the Fifth Circuit remanded this matter back to this Court with the following instructions:

> Because our opinion today announces a new legal rule, and out of an abundance of caution given the complex facts of the case before us, we remand this matter for the bankruptcy court to evaluate whether B &N is entitled to fees under the prospective, ''reasonable at the time'' standard.

*Id.* at 277.

After the district court remanded this case back to this Court, the Court conducted a status conference on May 11, 2015, to determine whether further evidence and/or briefing were necessary. B&N asked to provide further evidence in support of its amended fee application, but the Court found such evidence unnecessary given the prior hearing on this matter and that the fee application had been reviewed three times on appeal without any reviewing court holding that this Court had made insufficient or erroneous findings. The Court did allow the parties to submit further briefing regarding the Court's determination of B&N's fees under the prospective standard. Texas Skyline simply referred the Court to its brief on rehearing en banc and argued that this Court's analysis would equally apply under the new standard (ECF No. 423). The UST similarly argued that under the prospective

---

[12] *In re Ames Dept. Stores, Inc.*, 76 F.3d 66, 71 (2d Cir. 1996); *abrogated by* ***Lamie v. U.S. Trustee***, 540 U.S. 526 (2003) (finding that a fee award should be contingent on reasonably likely to benefit the estate standard); *In re Top Grade Sausage, Inc.*, 227 F.3d 123, 131-32 (3d Cir. 2000) (rejecting a standard under § 330 that required a hindsight evaluation); *In re Smith*, 317 F.3d 918, 926-27 (9th Cir. 2002) (§ 330(a)(4)(A) requires a prospective approach in fee awards).

standard, this Court's prior ruling comports with the new Fifth Circuit standard.  In support of this contention, the UST argues that:

> The UST also notes that every court that has considered the fee award in this case has either expressly or implicitly stated that under **any** standard of review for reasonableness under § 330, BNPC would not be entitled to the award of more fees than were already allowed by this Court. These courts have done so because the record in this case as considered by THIS court in the original hearing on the merits clearly supports that certain services provided were unreasonable and unnecessary to the administration of the estate and the goals of chapter 11 in the context of this case.

> United States Trustee's Brief at ¶ 3 (ECF No. 425).

> Additional filings by creditors should have put Applicant on notice of the inability of the Debtors to reorganize. The Texas Skyline creditors filed a § 523 adversary proceeding. Other partnership creditors also filed a § 523 complaint, alleging the same type of breach of fiduciary duties as Texas Skyline. These filings early on in the case should have alerted Applicant to the problems that their clients had created and continued to foster by their lack of candor during the case. This litigation approach against the debtors' principal creditors, including Texas Skyline, was never reasonably likely to result in a successful reorganization.

> United States Trustee's Brief at ¶ 13 (ECF No. 425).

B&N argues that this Court should examine the application period in phases.  The first phase included attempts at mediation from May 13-October 15, 2010.  *See* B&N Post Remand Brief at pp. 2-3 (ECF No. 424).  B&N indicates that the mediation process abruptly ended, notwithstanding the parties' initial willingness to settle.  *Id.* at 4.  The second phase was October 16-December 31, 2010, in which B&N had to amend the Debtor's schedules to account for undisclosed personal property and a purported agreement with John T. Baker. *Id.* at 4-5.  The third phase included further amendments to schedules; B&N opposing the motion to convert to chapter 7; and B&N's attempts to formulate a plan of reorganization acceptable to all creditors.  *Id.* at pp. 6-7.  Under this approach, B&N suggests that this Court

9

re-examine its fee determination that all the services provided by B&N are compensable under the new prospective standard.

B&N argues that, given the Court's prior ruling and the Fifth Circuit's subsequent en banc holding in this case, six categories of fees remain at issue. *Id*. at 12-13.[13] The Court will re-examine its prior determination as to those six categories of fees under the circuit's new standard—were the services reasonably likely to benefit the estate?

**Asset Analysis and Recovery**

B&N argues that analyzing Debtors' assets is a mandatory duty of debtor's counsel and should be allowed. Under the *Pro-Snax* standard, the Court only allowed $1,500.00 from this category. This category involved six subprojects:

> a. Providing information on Debtors' valuations to creditors and the U.S. Trustee and providing documentation to Baker in connection with proposed Rule 2004 exam ($1,032.50 over Periods One, Two and Three);
>
> b. Evaluating the statues disclosed by Baker's counsel ($822.50 during Periods Two and Three); and
>
> c. Conducting the Rule 2004 examination of Texas Skyline to evaluate its compliance with its fiduciary duties to Woerner, who was a limited partner, including a Motion to Compel ($3,922.00 during Periods One, Two and Three);
>
> d. Review of Debtors' banking records in response to allegations from Baker ($577.50 during Period Three);
>
> e. Motion for Partial Summary Judgment with regard to Constructive Lien on Woerner Homestead ($2,042.50 during Period Three); and
>
> f. Miscellaneous ($565.50).

---

[13] Some fee categories are not contested by any party because they were previously allowed by this Court. Further, B&N acknowledges that under Fifth Circuit precedent its fees for defending the Debtor against dischargeability actions under § 523(a) are not compensable. B&N also recognizes that its fees for opposing Texas Skyline's motion for relief from stay were reduced based upon the reasonableness of the fees. B&N is not seeking further review of this determination. Finally, B&N is not seeking further review of this Court's findings on the category of fees under business operations, financing and sale, and use or lease of assets.

B&N seeks total fees in this category of $8,692.50.  B&N argues that each of these services, except for the Motion for Partial Summary Judgment, was reasonable at the time. B&N argues that providing information requested by creditors and the U.S. Trustee is an obligation of a debtor in possession.  Upon learning of the missing statues, B&N maintains that counsel had an obligation to evaluate this asset of the estate.  Finally, B&N submits that the Rule 2004 examination was important because it concerned defenses which could be raised against the largest unsecured creditor of the estate.  Moreover, B&N notes that Texas Skyline refused to appear for its examination, prompting Debtors to file a Motion to Compel which was granted by the Court.  When the Court granted the Motion to Compel, it ruled that the examination was a reasonable action by Debtors' counsel.  B&N acknowledges that the Motion for Partial Summary Judgment was for the benefit of Debtors personally and is not compensable from the estate.  Upon further review, the Court finds that all fees requested in this category are allowed—with the exception of those attributed to the Motion for Summary Judgment—because these services were necessary at the time that they were performed.  The Court, therefore, allows fees in the amount of $6,920.00 (which includes the previously allowed amount of $1,500.00) for the category of "Asset Analysis and Recovery."  All other amounts requested in this category are denied.

**Case Administration**

B&N argues that the Case Administration category consists of mandatory duties, such as attending required meetings with the U.S. Trustee and creditors, filing Monthly Operating Reports and the discovery related to and hearings on the motions to convert and to compromise. It also includes time related to providing information to creditors and the

Motion to Compel Rule 2004 Exam of Texas Skyline which should have been included under Asset Analysis. The services in this category are for:

> a. The Initial Debtor Conference and the First Meeting of Creditors ($1,425.00 during Period One);
>
> b. Monthly operating reports ($150.00);
>
> c. Requests by creditors to obtain information through Rule 2004 examinations ($6,791.50 during Periods One and Two);
>
> d. Discussions with the U.S. Trustee ($385.00 during Period Two);
>
> e. Discovery with regard to Baker's Motion to Convert ($7,312.50 during Period Three); and
>
> f. The hearing upon Baker's Motion to Convert and the Joint Motion to Compromise with Baker ($30,468.00 during Periods Two and Three).

Under the ***Pro-Snax*** standard, the Court allowed $5,000.00 in this category which amounted to approximately 10% of the total amount requested. The Court agrees that the Initial Debtor Conference, the First Meeting of Creditors and filing monthly operating reports are all mandatory duties of a debtor. B&N argues that it was objectively reasonable for Debtors' counsel to perform these tasks. The Court agrees and those fees are allowed and were allowed pursuant to the Court's original ruling.

B&N argues that both Texas Skyline and John T. Baker, II requested information from Debtors by way of Rule 2004 examination. Debtors filed motions to quash which were successful in limiting the scope of the documents to be produced. B&N posits that providing information to creditors is a fundamental obligation of a debtor. Moreover, B&N maintains that, at the time that the discovery was requested, Debtor was working with the two creditors to reach negotiated settlements. Therefore, B&N states that these services were objectively

reasonable at the time.  The Court agrees and those fees related to requests by creditors through 2004 examination and discussions with the United States Trustee are allowed.

Additionally, B&N asserts that taking discovery with respect to the Baker Motion to Convert and to determine the grounds for his repudiation of the settlement was objectively reasonable.  Shortly before the scheduled hearing upon these motions, Baker announced that he was repudiating the agreement and proceeding with the Motion to Convert.  As such, B&N argues that it was incumbent upon Debtors to obtain an explanation as to what had occurred.  This was why Debtors took the depositions of John T. Baker, Sr. and John T. Baker, II.

Further, B&N argues that Debtors required discovery to determine the basis for the allegations contained in the Motion to Convert.  This was the reason for taking the depositions of Brandon Perkins and Willard Perkins, both of whom testified at the hearing on the Motion to Convert.  As a consequence of both the Motion to Convert and Motion to Compromise, B&N correctly notes this Court's own comments that the decision on the motions was "difficult."  *See* ECF No. 160, p. 4.  Additionally, B&N points out that the Court ruled partially in Debtors' favor by finding there was a binding agreement with John T. Baker, II but found that the mediated settlement should not be approved.  *Id*. at p. 12.

The difficulty with B&N's position is the assumption that, had the Joint Motion to Compromise been approved, the case would not have been converted to chapter 7.  While § 1112 does not allow a bankruptcy court to *sua sponte* dismiss or convert a chapter 11 case, once a motion is filed, the Court does have discretion—notwithstanding an agreement—to still determine whether conversion or dismissal is warranted.  Further, other parties in interest, such as Texas Skyline and the U.S. Trustee, would have urged conversion apart from

Baker's own request.  Here, as this Court has explained repeatedly, the facts of this case necessitated conversion to chapter 7 notwithstanding B&N's representation of Debtors.  No reviewing court found the Court's decision to convert the case to chapter 7 erroneous.  Even under the new prospective approach, this Court believes that the fees requested in this category are excessive based upon the likelihood at the time that Debtors' case would be converted—notwithstanding the Joint Motion to Compromise.  The Court recognizes that B&N had a duty to represent the Debtors, but the Court finds that compensation of $46,532.00 for the work performed in the "Case Administration" category is excessive under the circumstances of this case.

The Court finds that B&N should be awarded $8,751.50 for services related to the initial debtor conference and first meeting of creditors, monthly operating reports, discussions with the United State Trustee, and requests from creditors through 2004 examinations.  The Court, however, finds that B&N's request for fees of $37,780.50 for fees relating to discovery on Baker's Motion to Convert and the hearing on the Motion to Convert and Joint Motion to Compromise is excessive due to the fact that there was not a reasonable likelihood of success in reaching confirmation or avoiding conversion to Chapter 7 at this point in the case.  Thus, defending against the Motion to Convert to the tune of $37,780.50 was not reasonably likely to benefit the estate at the time those services were rendered.  The Court shall, therefore, limit the amount of fees awarded attributable to discovery and hearing on the Motion to Convert and Joint Motion for Compromise to $12,000.  As such, the total award of fees under the category "Case Administration" shall be $20,751.50.  All other amounts requested in this category are denied.

14

**Claims Determination**

This category involved numerous tasks, including the following:

a. Evaluation of the Texas Skyline claim prior to entry of the judgment and attendance at the hearing on entry of the judgment ($750.00 during Period One);

b. Negotiations with Texas Skyline outside of the formal mediation ($2,160.00 during Periods One, Two and Three);

c. Negotiations with John T. Baker, II resulting in a proposed settlement of his claim ($5,072.50 during Period Two);

d. Research with regard to repudiation of a settlement agreement which had not yet been approved by the Court ($1,072.50 during Period Three);

e. Objection to the Amended Claim of John T. Baker ($2,320.00 during Period Three);

f. Matters related to the constructive trust claim of Texas Skyline ($1,334.50 during Period Three); and

g. Miscellaneous claims-related matters ($1,592.00 during Periods One, Two and Three).

B&N suggests that this category exemplifies the difference between the hindsight and the "reasonable at the time" approach. At the outset of the case, B&N claims that it was necessary to conduct due diligence with regard to the Texas Skyline litigation. B&N maintains that Debtors engaged in settlement discussions with Texas Skyline from the beginning of the case until the day before the case was converted. Because Texas Skyline was the largest creditor in the case and one of the Debtor's two main antagonists, B&N states that it was objectively reasonable to continue to embrace Texas Skyline's invitations to negotiate.

B&N notes that much of this category relates to John T. Baker, II. B&N states that $5,072.50 relates to the attempts to negotiate a resolution of his claim, $1,072.50 relates to

efforts to enforce the settlement agreement and $2,320.00 applies to the objection to the amended claim filed by Baker late in the case. B&N argues that dealing with Baker was difficult because it was never clear what motivated Baker's dealings with Debtors. Baker purportedly brought up the concept of settling debts for partnership interests which formed the basis for Debtors' plan as well as the Motion to Compromise. B&N says that Baker repudiated this agreement and filed an amended claim for $608,338.73 late in the chapter 11 proceeding.[14] Baker also filed a nondischargeability case against Debtor but ultimately dismissed it.[15] B&N asserts that it was objectively reasonable for Debtors' counsel to engage with Baker, to negotiate with him, to attempt to hold him to the deal he made and then to object to an unsubstantiated claim. B&N concedes, however, that fees for the matters related to the constructive trust claim were solely for the benefit on the Debtor and are not allowable, even under the prospective standard.

The Court agrees that it is objectively reasonable for any debtor to negotiate a resolution with its creditors. In this context, Judge Michael Lynn's opinion in *In re Broughton Ltd. P'ship*, 474 B.R. 206 (Bankr. N.D. Tex. 2012), is instructive. In *Broughton*, special counsel was engaged to negotiate a purchase of the debtor's lots by a third party in hopes of proposing a confirmable plan. *Id*. at 208. Notwithstanding the efforts of special counsel, the negotiations failed. *Id*. at 209. The *Broughton* court found that engaging in negotiations to sell the debtor's primary assets to reach a consensual plan is precisely what

---

[14] *See* ECF No. 115, Debtors' proposed Chapter 11 plan wherein Debtors proposed to give partnership interests to Baker in exchange for satisfying his debt. Additionally, Debtors' post-conversion schedules (filed by new Debtors' counsel for the chapter 7 case) continue to reflect valuations that comport with what was asserted in the chapter 11 case. *See* ECF No. 187. The Court's independent review of the docket and associated filings, however, indicates that the Chapter 7 Trustee has sold a number of non-exempt personal property and partnership interests for significantly less than what have satisfied Baker's or Texas Skyline's claims.

[15] The adversary was dismissed after Clifford Woerner waived his chapter 7 discharge and Gail Woerner was dismissed from the chapter 7 case.

16

should occur in chapter 11 cases.  *Id*. at 213-14.  Moreover, the ***Broughton*** court found that, to the extent that the fees incurred at the time were reasonable, the fees should be allowed. ***Id***.  In keeping with the reasoning in ***Broughton*** and applying the prospective approach to fee awards, the Court finds that the fees requested in this category in the amount of $12,967.00 for negotiations in reaching a confirmable plan were reasonably likely to benefit the estate and shall be allowed.  The requested fees for the matters related to the constructive trust claim, however, were solely for the benefit on the Debtor and are not allowed.

**Disclosure Statement & Plan**

B&N correctly notes that one of the principal duties of debtor's counsel in a chapter 11 case is to advance a plan. As stated by retired Bankruptcy Judge Frank Monroe:

> The Court believes that counsel for the Debtor in possession was obliged to engage in the plan process under the specific facts of this case in accordance with its obligation to the creditors and this estate and in accordance with the respective canons of ethics which govern applicant's rendering of legal services.

*In re Spillman Dev. Grp., Ltd.*, 376 B.R. 543, 553 (Bankr. W.D. Tex. 2007).

B&N maintains that Debtors had the basics of a plan ready early in the case. However, B&N chose to pursue mediation with the Texas Skyline parties and negotiate an agreement with Baker in the hopes of being able to file an entirely consensual plan.  B&N argues that, when it became clear that one or more creditors wanted to proceed with conversion, B&N filed its plan to provide the parties with a clear alternative to conversion. B&N states that the plan had the support of at least two creditor groups—First State Bank and the IRS.  It should be noted, however, that there were multiple classes of claims for treatment and payment under the plan, and the IRS and First State Bank claims were significantly smaller than Baker's and Texas Skyline's claims.  *See* ECF No. 187.

17

The proposed plan incorporated the agreement which Baker had previously accepted and relied on a trustee to liquidate property for the benefit of creditors. The Plan provided for dedicating disposable income from Debtors and securing the obligation to unsecured creditors with a life insurance policy on the life of Woerner. B&N submits that, because the Court converted the case prior to allowing a hearing upon the plan, creditors were not given the opportunity to vote and the possible success of the plan is unknown. That said, creditors were afforded the opportunity to object at the hearing on the Motion to Convert with full knowledge that a plan had been filed. No creditors appeared in support of Debtors' opposition to conversion to chapter 7.

This is the most difficult aspect of B&N's fees to resolve. The undersigned judge presided over all of the proceedings through conversion to chapter 7 and adjudicated four dischargeability actions against Debtors. The Court had the definite conclusion early in the case that, notwithstanding B&N's efforts, there was never going to be a consensual plan. While the Court commends B&N's efforts at mediation, Debtors' pre-existing misappropriation of partnership assets that precipitated the filing of chapter 11 case, coupled with the repeated misrepresentations in schedules and Debtors' lack of credibility, leads this Court to the firm conclusion that this case was doomed from the start.

As such, this Court must balance the professional duty of the lawyer to represent the chapter 11 individual debtor against whether the services were reasonably necessary at the time they were rendered. In doing so, the Court believes that it should not reach the merits of whether a chapter 11 plan could be confirmed, but rather, could the case have proceeded to confirmation hearing in the context of a motion to convert the case to chapter 7. Under the circumstances of this case, the Court concludes that, based on the record before it, the

services related to the Disclosure Statement and Plan were not reasonably necessary at the time they were incurred. The Court understands the argument that the filing of a chapter 11 plan afforded creditors the prospect of repayment; however, that possibility is not supported by the record recognizing the lack of creditor support at the time of conversion to chapter 7. The fees requested in this category in the amount of $13,075.00 will not be allowed.

**Employment & Fees**

Previously, the Court denied all fees in this area. United States District Judge Sam Sparks allowed $787.50 in this category attributed to preparation of the application of Barron & Newburger, P.C. This category also included fees for preparing applications to employ Mark Cohen and Dan Krocker as special counsel, and Jeff Heard, an accountant. Each of these applications was filed during Period One and approved by the Court. B&N argues that one of the duties of debtor's counsel is to ensure that the estate properly employs all professionals who are to assist the debtor-in-possession. These fees were reasonable at the time. The Court agrees that the hiring of professionals and B&N's assistance with the professional fee applications was reasonable at the time the services were rendered. Fees in the amount of $3,172.50 in this category are, therefore, allowed in full.

**Filing Schedules & SOFA**

The Court allowed $2,500.00 and denied $2,500.00 for services related to preparing and filing schedules and amended schedules based upon *In re Matthews*, 154 B.R. 673 (Bankr. W.D. Tex. 1993). Of the total amount requested, $3,661.00 related to the initial schedules and statement of financial affairs filed in May 2010; $1,127.50 related to amended schedules and statement of financial affairs filed on November 2, 2010; and $211.50 related to an amended statement of financial affairs filed on February 2, 2011. B&N states that most

of the fees related to the initial schedules and statement of financial affairs.  B&N maintains the evidence established that, rather than simply relying on values provided by Debtors, counsel obtained a third party appraisal upon Debtors' personal property and obtained spreadsheets from the Debtor to establish the basis for his valuation of the partnership interests.  B&N states that, as a result of its efforts, several additional assets (all valued collectively at less than $10,000) were discovered and added to the schedules.  The Statement of Financial Affairs was also amended to disclose additional transactions. B&N also points out that in, January 2011, counsel learned that one of the items added to the SOFA listed certain guns as having been transferred to the wrong party.

B&N submits that this was not a case at all similar to *In re Matthews*, where counsel received information that it believed to be inaccurate and made numerous unsuccessful efforts to correct it.  The initial schedules listed 95% of the Debtor's assets.  Upon learning of errors, B&N made one amendment to the schedules and two amendments to the SOFA. B&N posits that this is what any responsible counsel would have done.  B&N suggests that, even if the Court believes that counsel should have withdrawn at the first hint of impropriety, counsel still had an ethical obligation to repair the error.

Even accepting B&N's argument that *Matthews* does not apply to the circumstances of this case, the Court still finds that fees requested in this category are excessive.  Simply put, schedules and a statement of financial affairs are customary in all bankruptcy cases. Moreover, the preparation of schedules in a chapter 13 individual case and those in an individual chapter 11 case are not that different.   What distinguishes chapter 13 and individual chapter 11 cases is many times the amount of debt involved.   The Court recognizes that the cost of a chapter 11 case is more than a chapter 13, but questions why it

20

cost over $5,000.00 to get accurate schedules and a statement of financial affairs.  The only explanation that B&N provided was that it had to independently verify Debtors' valuations of their own assets and that further inquiries were necessary when it became apparent that Debtors had not accounted for all their assets.  Here, the Court remains convinced that the time expended on filing the amended schedules and SOFAs was attributable to Debtors' conduct.  Neither the creditors nor the estate should have to bear the additional expense.  Under the facts of this case, the Court finds that original fee award of $2,500.00 is appropriate and will not award any additional fees in this category.

### CONCLUSION

For the reasons stated herein, the Court finds that B&N's Amended Fee Application is GRANTED and shall be allowed in the amount of $46,311.00.[16]  All other relief is DENIED.


# # #

---

[16] This award of fees in the amount of $46,311.00 is inclusive of the Court's previous award of fees in the amount of $19,409.00 and the District Court's award of $787.50.